FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

14 MAR 31  P 3:38

CLERK, U.S. DISTRICT C...

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

Henry F. Butler

                Plaintiff,

                                                                             Case No. 13-1043-EFM

v.

THE BOEING COMPANY, and SPIRIT AEROSYSTEMS,

                Defendants.

**PRO SE PLAINTIFFS RESPONSE TO THE COURTS ORDER TO PROCEED WITH STATUS CONFERENCE AND TO PROVIDE SUPPORTING EVIDENCE AS TO WHY PLAINTIFFS REQUEST FOR STAY/DISMISSAL WITHOUT PREJUDICE, SHOULD BE GRANTED**

       Plaintiff hereby responds to the Courts order dated March 27th 2014 ordering the plaintiff to proceed with the April 1st 2014 status conference.

       Plaintiff takes this opportunity to address the issues not mentioned in the Courts Memorandum and Order, document (17), filed March 18th 2014; where the Court addressed Plaintiffs "Motion to Reconsider" and assigned Plaintiffs "Motion to Stay", Document (11) to the Magistrate Judge.

       The issues not addressed by Plaintiff in his response filed on March 28th in response to the Courts document number (17), Memorandum and Order; are hereby stated and addressed at this juncture as plaintiff states they appear of *greater* relevance and *more* applicable; are as follows:

       Pursuant to the language in the Memorandum and Order, Document (17), dated March 18th 2014; Plaintiff "requested a stay until he could obtain counsel; are pro se through no fault of their own; complains of the difficulty he is having in finding counsel to represent him; the necessity of counsel in his opinion; and his opinions as to why no counsel wants to take his case."

       First and foremost, Plaintiff *hereby* cites his "Response" dated March 28th 2014, as sufficient to respond to the Courts stated position as to plaintiff's representation of his allegations and request before the Court; given plaintiffs pro se status.

1

Second, all statements/language contained in the Memorandum and Order concerning Plaintiffs plight obtaining counsel in this litigation are valid and factual and deserving of true consideration and attention in what is suppose to be a fair and impartial process.

Plaintiff *hereby* request his response Document dated March 28th be considered in its entirety along with the supporting attachments provided herewith; as evidence in *further* support of the granting of Plaintiffs continued effort to acquire a stay and or dismissal of the proceedings without prejudice in lieu of a dismissal for lack of prosecution; which, under the circumstances, is inapplicable.

Plaintiff would *hereby* remind this Court and the parties; that there was a time in this country in the mid to late 1800's when it was *legal* to discriminate against "people of color" and those instances; which consisted of the "fugitive Slave Act, The Three Fifths Compromise, and The Dred Scott Decision to name a few, were decreed and sanctioned by the high Courts. *This fact alone; should move this Court to give heightened consideration to plaintiffs allegations and request.*

Those aforementioned days and times were dubbed "The African American Experience in the United States" by author Chris Hedges, in his book Empire of Illusion; where he states African Americans were the only people *legally discriminated* against in this fashion in the history of the country. *It appears; times have not changed so much.*

What plaintiff has experienced thus far with the civil justice system as a minority citizen is reminiscent of those aforementioned times; but it is apparent and confirmed by studies that, injustice has permeated throughout the civil justice process, *affecting everyone;* not privileged. That's a *systemic* issue.

The attached references to and excerpts from the supporting documentation, provides *indisputable data and statistical evidence* to include professional opinions by judges, attorneys and other qualified authorities, that plaintiff's allegations have merit. There is something *awry* with the civil justice system, and plaintiff's claims have been jeopardized as a result.

In closing, plaintiff *hereby* request the Court to allow plaintiff to decline participation in these proceedings; and protect/preserve his claims; for the reasons given in this request and previous responses addressing plaintiffs allegations, until such time plaintiffs valid allegations have been acknowledged and addressed by a proper office of authority.

Respectfully submitted this 31[th] day of March 2014

*[signature]*

Henry F. Butler, Pro se

4119 Brooks St.

Wichita, Kansas 67220

2

# Frederic Bastiat

(1801-1850)

# The Law

*The Law is here presented again because the same situation exists in America today as in the France of 1848.*

*The law perverted! And the police powers of the state perverted along with it! The law, I say, not only turned from its proper purpose but made to follow an entirely contrary purpose! The law become the weapon of every kind of greed! Instead of checking crime, the law itself guilty of the evils it is supposed to punish!*

*If this is true, it is a serious fact, and moral duty requires me to call the attention of my fellow-citizens to it.*

## The Results of Legal Plunder

It is impossible to introduce into society a greater change and a greater evil than this: the conversion of the law into an instrument of plunder.

What are the consequences of such a perversion? It would require volumes to describe them all. Thus we must content ourselves with pointing out the most striking.

In the first place, it erases from everyone's conscience the distinction between justice and injustice.

No society can exist unless the laws are respected to a certain degree. *The safest way to make laws respected is to make them respectable*. When law and morality contradict each other, the citizen has the cruel alternative of either losing his moral sense or losing his respect for the law. These two evils are of equal consequence, and it would be difficult for a person to choose between them.

The nature of law is to maintain justice. This is so much the case that, in the minds of the people, law and justice are one and the same thing. *There is in all of us a strong disposition to believe that anything lawful is also legitimate.* This belief is so widespread that many persons have erroneously held that things are "*just*" because law makes them so. *Thus, in order to make plunder appear just and sacred to many consciences, it is only necessary for the law to decree and sanction it.*




Exhibit 2
2 pages

WRITTEN STATEMENT
Of

Rebecca Love Kourlis
Executive Director
Institute for the Advancement of the American Legal System
University of Denver

on "The Costs and Burdens of Civil Discovery"
December 13, 2011

Before the
Subcommittee on the Constitution
Committee on the Judiciary
United States House of Representatives

Race, Racism and the Law

The Devastating Impact of the Justice System on the Status of African-American Males: an Overview Perspective

## CONCLUSION

*An overwhelming number of empirical studies and reports conclude that disparity in the treatment of African-American males exists in the justice system.* Similarly, other institutional systems mirror the same negative disparities between African-American males and non-minorities. Even institutional policies and practices that appear to be neutral on their face have a disparate impact on minorities, and African-American males in particular. This disparity is the result of stereotypical biases and racism intentionally and unintentionally directed at African-American males. *Many African-American males appear to have fallen prey to negative stereotypical biases which permeate throughout the justice and other institutional systems.*

As a result of the disparities, stereotypical biases, and racism in the justice and institutional systems, the status of many African-American males has reached a crisis. Ironically, the courts and Congress have repeatedly acknowledged the disparities, even racism, within the various systems, but, nevertheless have failed to issue or promulgate corrective action. Instead, the criminal justice system continues to disproportionately "lock them up." Congress and state legislatures continue to propose additional legislation to lock up even more, and law enforcement agencies target African-American males for arrest and prosecution. *Clearly, racism and disparity also exist in the civil justice system. African-American males have little faith that they will receive equal justice, particularly in a system where judges are biased, where there is a lack of adequate legal representation for minorities, and where minorities are disproportionately underrepresented in the justice system work force.*

Much of the attention of the last 40 years has focused on individual racist behavior. However, just as individuals can act in racist ways, so can institutions.

Institutions can behave in ways that are overtly racist (i.e., specifically excluding people-of-color from services) or inherently racist (i.e., adopting policies that while not specifically directed at excluding people-of-color, nevertheless result in their exclusion).

Therefore, institutions can respond to people-of-color and whites differently. Institutional behavior can injure people-of-color; and, when it does, it is nonetheless racist in outcome if not in intent.

Vernellia R. Randall, Professor of Law, University of Dayton, Ohio

*Exhibit 4*
*2 pages*



SCHOOL *of* LAW

# LESSONS IN LOSING: RACE DISCRIMINATION IN EMPLOYMENT

## Wendy Parker

Wake Forest University Research Paper Series in Legal Studies
Working Paper No. 678082
May 4, 2009

This paper can be downloaded without charge from the
Social Science Research Network Electronic Paper Collection:
http://ssrn.com/abstract=678082

## Lessons in Losing: Race Discrimination in Employment

## Conclusion

**Anti-plaintiff ideologies exist within the federal judicial process where certain claims are concerned:**

The shockingly low win rate, coupled with the overall lower settlement rate as compared to plaintiffs in all employment discrimination cases *and* the low percentage of settlements even when plaintiff prevailed on a pretrial motion *and* the more favorable plaintiff outcomes in gender cases, to me demonstrates that race and national origin plaintiffs face particularly difficult hurdles.

Although plaintiffs bargaining for settlements do so in the shadow of the law and with the threat of a jury trial, that shadow actually just hangs over the plaintiffs, who must settle or almost certainly get nothing.

Defendants, on the other hand, are bargaining, basking almost, in bright sunshine from the courts. If we are to bring sunshine to both sides of the typical race and national origin suit, and clarity to our current understanding of judicial decision making in these cases, then we must recognize that courts are doing more than deferring to defendants.

Instead, they seem particularly hesitant of certain types of claims, including race and national origin ones. Only by recognizing the unique challenges of race and national origin cases can we one day overcome them.

Professor Wendy Parker, Legal Studies

# INSTITUTIONAL DISCRIMINATION
by Jo Freeman

This text is based on a lecture given frequently in the 1970s.


Discrimination can occur both individually and institutionally. Acts of individual discrimination are often both conscious and obvious. They can be dealt with by either removing the person who discriminates from any position where such actions are meaningful or by inducing the person to halt the behavior in question. Institutional discrimination is built into the structure itself. Thus it in more covert and more tenacious. It can occur regardless of the desires or intentions of the people perpetuating it.

Consequently, one must not ask what are the *motives* of the individuals involved but what are the *results* of their actions. Institutional discrimination is may easily seen statistically. If a particular group is disproportionately absent in comparison to the pool of those possessing the relevant skills, discrimination is occurring even if it is impossible to document specific individual instances. (Such discrimination may also be affecting the pool of available talent, but that requires action on a different level).

As institutional discrimination is built into the normal working relationships of institutions, its perpetuation requires only that people continue "business as usual." Its eradication requires much more than good will; it requires active review of the assumptions and practices by which the institution operates, and revision of those found to have discriminatory results. Such an operation cannot be approached casually; inevitably, extra effort is necessary.

**Institutionalized discrimination** refers to the unjust and discriminatory mistreatment of an individual or group of individuals by organizations such as governments and corporations, financial institutions (banks, investment firms, money markets), public institutions (schools, police forces, healthcare centers), and other societal entities. It stems from systemic stereotypical beliefs (such as sexist or racist beliefs) that are held by the vast majority living in a society where stereotypes and discrimination are the norm (see institutionalized racism).[1] Such discrimination is typically codified into the operating procedures, policies, laws, or objectives of such institutions. Members of minority groups such as populations of African descent in the U.S. or members of the LGBT community, are at a much higher risk of encountering these types of sociostructural disadvantage. Among the severe and long-lasting detrimental effects of institutionalized discrimination on affected populations are increased suicide rates, suppressed attainment of wealth and decreased access to health care.

Usually the bias targets specific, facile attributes including race, gender, nationality, sexual orientation, and age. Though direct discrimination is legally iniquitous by United States law, scholarship in the social sciences and humanities typically concurs that it exists in some of the social institutions and practices carried out in every day life. Institutionalized discrimination prohibits the attainment of societal meritocracy.

Examples of institutionalized discrimination include laws and decisions that reflect racism, such as the *Plessy vs. Ferguson* U.S. Supreme Court case. The verdict of this case ruled in favor of separate but equal public facilities between African Americans and non-African Americans. This ruling was struck down by the *Brown vs. Board of Education* Supreme Court decision. Institutionalized discrimination often exists within the government, though it can also occur in any other type of social institution including religion, education and marriage. Achievement gaps in education *per se* are an example of institutionalized discrimination. Two recent studies aimed to explain the complications of assessing educational progress within the United States. One study focused on high school graduation rates, whereas the other study compared dropout rates in suburban and urban schools. By taking a closer look at statistics of test scores and academic achievement, researchers noticed that wealthy whites do better than blacks, poor whites, and Latinos. According to Star Parker, reporter of the *Durham Herald Sun*, graduation rates among whites and Asians are about 25 percent higher than those of minority groups (blacks, Hispanics, American Indians). This signifies that academic achievement is linked to socioeconomic status.[2] There are also wage gaps between workers of different races. For example, the U.S. Bureau of Labor Statistics found in 2007 that white, black and Hispanic men make 84%, 64% and 56% the wage of Asian men.[3]

*Exhibit 6*
*5 pages*

# Boeing's Cash Cow

## A corporate strategy's impact on middle-class America

Jack Norman
April 2010

### Part One: What Boeing Wants

The 'cash cow' presentation in Savannah divided incentives into three categories: hard costs, human resource costs and soft costs. For this report, we'll summarize these in the following terms:

☐☐ Hard costs: A demand for maximum breaks on all income, property and sales taxes;

☐☐ Human resource costs: A demand both for government assistance but more importantly for a submissive work force, a non-union employee base eager to work for reduced wages;

☐☐ Soft costs: A demand for a high level of infrastructure, from specially-built roads and harbors and airfields, to quality schools and colleges with Boeing-tailored aerospace programs, to an overall quality of life that attracts employees.

or are they using this opportunity to really squeeze the state of Washington for deeper incentives."[27]

The economic development director of Palmdale, California, said: "What I hear from people, including some of our elected officials, is this: 'We're still not 100 percent convinced that Boeing is not doing this just to get Washington to cough up money. To go through a lot of brain damage just to get Boeing a better deal in Washington is not something we want to do." Palmdale submitted a proposal anyway.[28]

And in December, Boeing announced that, indeed, Washington was the winner. As would happen later in South Carolina, it took a barrage of freedom-of-information demands before the full details of the package were unveiled. Washington's $3.2 billion incentive package, in addition to the changes in workers compensation and unemployment, along with construction at the port and on the highways, included:

- A 40% cut in Boeing's Business & Occupation tax (a tax on receipts, what Washington has instead of a corporate income tax);

- A further tax credit of 1.5% of all Boeing's preproduction development expenses for any aircraft;

- $20 million in rebates for previously paid sales taxes on computer hardware and software;

- Exemption from sales tax on new purchases of computer equipment and software;

- Exemption from sales tax on labor, materials and fixtures in the new assembly line;

- Exemption from property taxes on the new plant, including its equipment;

- Exemption from leasehold taxes for Boeing facilities in the public port;

- And a continuation of all tax incentives through June 30, 2024.

Washington had won the battle for assembling the 787.

The 787, made mostly with composite materials rather than metals, is a big deal. The company calls it "the most important new airplane since the Boeing 707 at the dawn of the Jet Age, half a century ago."[29] It quickly became the best-selling new airplane in history, with nearly 900 of the giant aircraft ordered by airlines around the world even before the first test model had been built. Its sales book tallied over $120 billion in purchase orders.

Within a year of picking Washington for its assembly line, Boeing had begun new operations in South Carolina, to serve as a subassembly site for the 787. The company would use a new system for building the 787. Most of the work would be done in subassembly plants rather than in Boeing's Washington operations, with partially completed airplanes shipped to Washington for only the final piecing together. When Boeing decided to put its second 787 assembly line in South Carolina, it meant that soon some of the 787 production would never go through Washington.

### B. Human resource costs – low-cost work force

The second category of demands relates to human resource costs. In addition to wage rebates and job-creation tax incentives, employee training grants, targeted employment credits and help with hiring, this includes an ample supply of 'acceptable' workers. The word "acceptable" summarizes a willingness to work for less than middle-income wages, a resistance to labor unions and support for local political compliance with company interests.

This is easiest to see in the contrast between workforces in the Seattle area and the Charleston area. It is a major part of the reason why Boeing chose to put its second 787 assembly line in Charleston rather than Seattle. The difference in wages was made explicit by the Seattle *Times*, which reported last October on some of the conditions in the Charleston subassembly plant.

The newspaper reported that because Charleston didn't have enough skilled workers to do Boeing's somewhat challenging work, at least one-third of the employees there were free-lance machinists hired from across the U.S. and other countries. These temporary workers were "experienced airplane mechanics paid about $26 an hour, compared with the $14 an hour for local employees." The $26 wage, the *Times* notes, is the average Boeing wage for union machinists in Everett, Washington.[30]

The difference between $26 an hour and $14 an hour is exactly the difference between a middle-class job and one that does not measure up to that designation. The higher rate translates into about $54,000 a year; the lower rate to about $29,000.

Consider these federal statistics on income distribution in America, in which household incomes are divided into five equal parts, from the lowest-paid fifth to the highest-paid fifth. The average income in the middle-fifth in 2008 was $50,132. This would place the household of a $26/hour Boeing worker (if he/she were the sole worker in the home) about 8% higher than the average for America.

Now step down one category, from the middle fifth to the second-lowest fifth. The average income was $29,517, according to the US Census Bureau. This is the equivalent of Boeing's $14/hour worker.

By downgrading its production workforce from a $26 wage to a $14 wage, Boeing drops its workers from being in the middle income fifth to a lower bracket. In Boeing's future, today's middle fifth would disappear into the lower bracket.

The absence of unions in Charleston was an important factor for Boeing. In South Carolina, 4.5% of workers belong to unions, the 3rd lowest rate in the nation. In Washington, 20.2% of workers are unionized, the 4th highest in the nation.[31] South Carolina's laws are among the most union-hostile in the country. This includes a 'right-to-work' law so even in a unionized workplace, employees cannot be required to join a union.

The contrast between Washington and South Carolina goes much deeper than wages and unions. The difference in quality of life can be seen in a variety of statistics. For example, South Carolina has the third highest infant mortality rate in the U.S. (9 per 1,000 births); Washington has the third lowest (5).[32] In the proportion of adults with a college degree, South Carolina ranks 40th (24%); Washington is 12th (31%).[33] In the proportion of children living in poverty, South Carolina ranks 11th (21.7%); Washington is 36th (14.3%).[34]

Boeing frequently blamed its unions, especially the International Association of Machinists and Aerospace Workers, which represents Boeing production workers in many locations, for strikes and wage increases. "The overriding factor" in choosing South Carolina, said Boeing's Jim Albaugh, CEO of the company's Commercial Airplanes unit, "was that we can't afford to have a work stoppage every three years. And we can't afford to continue the rate of escalation of wages."[35]

Albaugh's comment about "the rate of escalation of wages" is a clear statement that the $26-an-hour, middle-class wage of Boeing's Seattle-area production workers is not to be continued. Even the slow growth that has characterized overall wage gains in recent years it too much for Boeing, Albaugh says. The point is straightforward: Boeing will not continue to support middle-class wages for the bulk of its employees.

Why don't unions organize Boeing's South Carolina workers? They did. During the early stages of setting up a worldwide production system to build the 787, Boeing gave a subassembly contract to Vought Aircraft Industries, a Texas-based company that would build 787 rear fuselage sections in North Charleston. The Machinists won bargaining rights at the Vought North Charleston plant in 2007 and the next year negotiated a contract that was to run until November 2011.

But by the middle of 2008, the entire 787 program was way behind schedule. The various South Carolina operations, including the Vought plant, contributed to the delays, having "been plagued with startup problems, partly due to the inexperienced work force," said the Seattle *Times*. So in stages Boeing bought out various subassembly plants in South Carolina it had been using as subcontractors.

In July 2009, Boeing completed its acquisition of the Vought South Carolina plant, with its unionized workforce. This would have brought Charleston's unionized workers into Boeing itself, a major strategic inroad for the Machinists' effort to bring unions to the area.

But on July 30, 2009, the same day the acquisition of Vought North Charleston was announced, a decertification petition was filed with federal labor officials. In the September election, the union was decertified. The next month – free from a union presence in North Charleston – Boeing announced that South Carolina had won the competition for siting the second 787 assembly line.

There was no mistaking the message that was heard across the nation. Under the headline "Boeing's S.C. jobs a setback for unions," the Washington *Post* quoted a labor expert as saying: "This is the escape from collective bargaining."[36]

Boeing also had at one time a large number of Machinist-represented workers in its extensive operations in the Wichita, Kansas area. But in recent years Boeing has divested itself of most of those operations, selling off its unionized commercial aircraft facilities there to a new company it helped establish, Spirit Aerospace. In 2001, Boeing employed 16,700 people in Kansas. By 2007, that had plunged to under 3,000.[37]

### The irony of job growth promises

Why do state and local governments give the incentives? Obviously, the answer is jobs. The only way to imagine that the long-term tax breaks are worthwhile is to assume that their cost will be trumped by the value of the jobs Boeing brings to the community. The facts do not support such an optimistic view of how Boeing operates.

First, Boeing itself is not in the business of creating jobs. Its strategy is just the opposite – worldwide global outsourcing and – at most – a stable number of employees. At the end of 1998, Boeing employed 231,260 people. Ten years later that had dropped to 162,191.[38]

In Washington state, for example, Boeing seriously overstated the employment impact of its decision to locate the first 787 assembly line there. The Seattle *Times* reported, "In 2003, state officials forecast that the 787 would add 3,600 supplier jobs at existing Boeing subcontractors and at new suppliers drawn to Washington. But four years later, new suppliers have established just four modest new Dreamliner manufacturing operations employing around 200 people in Washington, half of those jobs in unskilled assembly or distribution work."[39]

The newspaper quoted a former Boeing executive – who left the company to work for the state on economic development issues – acknowledging, "We have failed miserably at attracting new engineering companies. We missed out on the big stuff."

Further, Boeing has long maintained a two-tier wage structure, even in Washington where its own employees are well paid. The "flinty reality" of the aerospace industry, as the Seattle *Times* put it, "Outside Boeing, the hours are long and the pay is hardly sky-high."[40] In 2007, the newspaper analyzed wages at Boeing and an additional 160 companies claiming state tax breaks for aerospace. It found that while 93% of Boeing's production workers earned at least $20 an hour, only 21% of non-Boeing workers earned that much. Nearly half the non-Boeing workers earned less than $15 an hour, compared with only 4% of Boeing's workers. Similar discrepancies were found among engineers.

## Summary and Conclusion

Boeing has positioned itself to be a model for the global corporation of the 21st century. This model pressures state and local governments to reduce taxes and provide lavish financial incentives to come and stay in any given locality. In addition, the Boeing model wants governmental sanction and support to offer lower wages and benefits for the same work with no-cost human resource services and training. On top of these, the new model demands that government provide extensive financing and infrastructure to support operations. The Boeing model uses sophisticated marketing, heavy-handed relationships with key decision makers and the fear of job loss to enforce its agenda.

Boeing and those who follow its lead drain resources from employees and governments while demanding investment in roads, sewers, and supplementary systems to facilitate expansion. The multiple demands leave state and local governments incapable of maintaining the intricate network of programs that are vital for communities to thrive. This also erodes the public sector framework for growing and maintaining a strong middle class – education, public health and safety, transportation, housing and investments in technology.

This is the bottom line for Boeing's 'cash cow' approach to local government. The combination of demands for low taxes, low wages and high-cost infrastructure is unsustainable. In 2004, a review of state taxes by the University of Kansas summarized the consequences clearly: "Low business costs generally translate into low wages and low tax revenues. Low wages generally translate into low incomes, and low tax revenues generally translate into low levels of educational expenditure and other government services. And low income and low services generally translate into a low quality of life."[64]

That's not how the company sees it, of course. Boeing and its top executives are self-consciously bold, buoyant, futuristic, optimistic. That's why it calls the new 787 aircraft the Dreamliner. But Boeing's 'dream' scenario clashes with the realities of how it conducts business. Boeing makes impossible demands of communities that simply cannot be satisfied in a world of shared prosperity. The only way that states and communities can satisfy Boeing's insatiable demands is by disassembling its prize public structures and borrowing unsustainably into the future.

In the long run, Boeing's model for the new global corporation is a recipe for an America without a middle class.

Exhibit 1
1 page

# PROJECT ON GOVERNMENT OVERSIGHT
# FEDERAL CONTRACT MISCONDUCT DATA BASE

**About POGO's Federal Contractor Misconduct Database (FCMD)**

The government awards contracts to companies with histories of misconduct such as contract fraud and environmental, ethics, and labor violations. In the absence of a centralized federal database listing instances of misconduct, the Project On Government Oversight (POGO) is providing such data. We believe that it will lead to improved contracting decisions and public access to information about how the government spends hundreds of billions of taxpayer money each year on goods and services.

**Top 100 Contractors**

| Contractor | Federal Contract $ (FY2011) | Instances of Misconduct (Since 1995) | Misconduct $ (Since 1995) |
|---|---|---|---|
| 1. Lockheed Martin | $42446.9m | 59 | $ 606.0m |
| 2. Boeing Company | $21599.2m | 47 | $1254.5m |
| 3. General Dynamics | $19442.8m | 14 | $ 278.5m |
| 4. Northrop Grumman | $15020.1m | 35 | $ 850.7m |
| 5. Raytheon Company | $14771.1m | 22 | $ 479.2m |
| 6. United Technologies Corporation | $7908.1m | 17 | $1123.1m |
| 7. SAIC | $7379.0m | 13 | $ 533.3m |
| 8. L-3 Communications | $7357.7m | 9 | $ 48.9m |
| 9. BAE Systems | $6876.3m | 13 | $ 588.2m |
| 10. Oshkosh Truck Corporation | $4942.1m | 0 | |

It is worth noting, when plaintiff initiated his original complaint back in 1998, this defendant was documented as having (11) "instances of misconduct." The current number of misconduct documented on this contractor implies there has been no real deterrence exercised on the part of the proper offices of authority responsible for monitoring Federal Government Contractors.